May it please the court, your honors, counsel. My name is Nova Jansen and I'm very pleased to represent the appellant in this case today, Elizabeth Lopez. I'd like to reserve three minutes of my time for rebuttal. Lopez was convicted by a jury following a two-day jury trial in May of 2016. In particular, she was convicted of possessing methamphetamine with intent to distribute and a conspiracy to distribute methamphetamine. Now, just by way of a very, very brief factual background, Lopez didn't come to the attention of law enforcement until the arrest of an individual named Josh Navrakol. And Navrakol had been under investigation for a while. Law enforcement executed several warrants, found numerous ounces of methamphetamine, firearms, guns, the whole nine yards. During an interrogation with Navrakol, law enforcement asked him to dial for dope. And Navrakol pulled out of his phone a phone number for someone that he called Omaha Mexican lady, which turned out to be Elizabeth Lopez. And he called her. But an important thing about this call is that while Lopez answered the phone, she handed it off to another individual. And this other individual was nicknamed Bisho. And this was about a 15 second phone call, no specific references to drugs or to money. In fact, it's kind of questionable whether there was even any sort of drug jargon in use here. The entire conversation was, are you coming? Are you ready? Yes, I'll be there shortly. That was, that was it. So a few hours later, law enforcement had arranged in light of this information for what they term a buy bust. Lopez and Bisho arrive in Sioux City and law enforcement kind of ensuring they term it a buy bust, but they didn't actually allow a transaction to occur. Instead, they boxed in the car. They took the occupants out of the car and Lopez almost immediately, even prior to being searched said, I have methamphetamine in my, in my bra. It's my use quantity. Nothing else was found in this vehicle, nothing on Bisho, nothing in the vehicle, nothing of evidentiary value. And so of course that formed the basis for the possession, the possession with intent to distribute charge. Now the conspiracy charge was really underlied by historical testimony by Josh Navarco, who was facing some very, very serious charges, admitted on numerous occasions that he lied to law enforcement. In fact, at one point, he even denied to law enforcement that he dialed Elizabeth Lopez for dope. He said, you know, I wasn't in a conspiracy to do anything with anybody that I was just calling to ask these individuals to come to Sioux City. I'm assuming he was cross-examined on all of this. He was, Your Honor. Yes. Now we've raised four issues on appeal, but today I'd really like to focus the court's attention to this first issue, the matter of hearsay testimony by the government's spirit witness, special agent Minton. And I would point out that this argument ties in fairly closely with our fourth argument, that there was insufficient evidence to sustain Lopez's conviction. Now at the trial, all of the parties and indeed the district court even recognized that the fighting issue in the case was, was Ms. Lopez a user or a dealer of methamphetamine? And of course, at the time of her arrest, she had specifically said before any questioning, this is my personal stash. I'm going to use it. Now at trial, she offered some expert testimony in support of that, that of her drug counselor, Isabel Diaz. And Diaz testified that Lopez had been on a drug binge for about three months and that in her experience, a normal user on a binge could use about seven and a half grams or up to seven and a half grams per day of methamphetamine. And if the jury believed this testimony from Ms. Diaz, that would certainly support her defense that she was a mere user of methamphetamine because 26.1 grams of meth, slightly less than an ounce could be used at that rate, a little less than four days. So very important. Now the government on this fighting issue in the case, the government presented the testimony of a special agent Minton and Minton testified about lots of different things about the nature of drug transactions and things like that. And he, he specifically indicated that he was a well-trained agent. He had lots of experience and he started to testify. He was asked what is a reasonable personal use quantity. And what agent Minton said was it kind of depends on how long someone's been using. If they've only been using for a very short period of time, maybe a quarter of a gram. And then this is where we run into a problem. And this is where I think that this case is, is really significant in that it gives the overall impression that a miscarriage of justice may have occurred in the trial. Agent Minton over Lopez's objection, he had initially started to testify that I met a subject that I'd arrested. And just in general conversation, I asked how much he was using and he told me, and Lopez objects at this point and the district court overrules that objection. And agent Minton then goes on to say, this unidentified user stated that he was doing two grams of crystal meth per day. And he had been doing this for approximately two years. And this is where it gets really sticky. In my opinion, agent Minton goes on to say, and I believed him, his body was wrecked. He was just a mess. And other than that, I don't think I've ever had anyone tell me they've used more than a gram per day. Now I submit to your honors that in the context of this case, where the fighting issue, the singular issue that the jury really needed to focus on was whether Ms. Lopez was a user or a prejudicial. It kind of infected every component of the case. And I'll explain to you why. Now, first it's clear that rule 703 allows an expert to base his opinion on inadmissible evidence like hearsay. And we certainly don't have any concern with that. I mean, Mr. Agent Minton was a very well-qualified DEA agent, but when it came to his knowledge about personal use, he specifically testified on the record that all of his knowledge about personal use just came kind of in general conversation, talking to people that he arrested, their family members and associates. Now I would note that in United States versus Avalos 817 F3597, this court said that an expert opinion needs to be based upon more than the mere hearsay testimony of non-witnesses and drug dealers. And we would maintain that under that standard, it's very questionable whether agent Minton was qualified to talk about reasonable personal use quantities. However, I do recognize that there's quite a bit of case law from this court where extremely trained agents, such as Agent Minton, were allowed to testify about reasonable use. That's not really the argument you made in your briefs, is it? No, your honor. And I'm going to turn to that argument right now. So assuming that this was proper in the first place, and this really didn't come up before the trial because it wasn't fully known what Agent Minton's expertise was in the area of personal use. But assuming that this was proper expert testimony, he went too far. He wasn't allowed to tell the jury the information, the hearsay, which is inadmissible underlying this testimony. And he certainly wasn't warranted in commenting on the credibility of that testimony. Now, the government asserts that this testimony was not hearsay. And they say it was just offered to prove that Agent Minton had never heard of reasonable use quantity. Well, it's basically an argument that it wasn't offered for the truth of the matter asserted in the statement. Right. Yes, that's absolutely correct, your honor. They're saying it wasn't offered for the truth of the matter asserted. It was offered for this other reason. But I would point out that in United States versus Love, which we cite in our reply brief at page seven, this court said that testimony is still hearsay where the proper testimony would only have the desired effect if, in fact, the statement was true. And in this case, Agent Minton's own words demonstrate that his intent in detailing the comments of this unidentified user to the jury was to prove that they were true, not just to explain that he'd never heard of anyone. And so just as in Love, this statement really had no sufficient bearing on what was happening in this case. Under Rule 703, an expert is only allowed to tell the jury the hearsay information underlying their opinions if that evidence would be probative value in helping the jury evaluate the opinion of the expert. And in this case, it did no such thing. Agent Minton had already told the jury, here's where I got my information from. I talked to people that I arrest and I talked to their associates. There was absolutely no basis for that. He compounded the problem by gratuitously commenting on the believability of that hearsay testimony. He said, I believed this person because his body was a mess and he was a wreck. But how prejudicial is the testimony about the quantity when the defendants expert put evidence in the record of even more? I think that he'd heard of people using seven, up to seven grams. Right. And for that purpose, your honor, that's exactly why it was prejudicial, because Lopez's position was that a reasonable user could use about seven and a half grams a day. And so she had twenty six, approximately twenty six grams in her in her bra that day. As a personal user, if she could use seven and a half grams a day, if that's a reasonable personal use quantity, she could have used that in just a couple of days. Now, if you're talking about two grams and that that turns it into several weeks worth of personal use quantity to be carrying around with you. So this was the issue in the case because. But it really doesn't matter, does it? That this unidentified person, whether it's true or not, that the unidentified person used only two grams. Well, I think in this context, your honor, that it does matter. OK, what's the difference between that? Which, I mean, I tend to agree with you. That's probably not the best way to do it. But what's the difference between what happened and him saying just what you said? I think two grams is the most anybody would use. What's the basis for that? Well, I've talked to lots of drug users. Well, I think if Agent Minton had just said, I've talked to lots of drug users and no one's ever told me they used more than two grams per day. I think if you'd only said that, we wouldn't be arguing about this today. I guess that's my point. What's the difference between that and and saying I'm basing this on some unidentified person? Well, I think that the problem here is that is that Agent Minton violated Rule 703 by telling the jury this and more so by commenting on the believability of that testimony. Your argument is not a 703 argument. It's an 800 argument, right? Yes, your honor. It is. It is hearsay. And I do think that we did acknowledge in our brief after the government raised the issue that this is clearly proper testimony under 703 that that we did acknowledge that when the appellant's attorney when the appellant's expert says, I've heard, could an objection have been made on hearsay? I'm sorry, your honor. When the expert for the appellant testifies, I have heard and then is about to continue with that individuals have used up to seven. Could that have been objected on the basis of hearsay? No, your honor. And just as with Isabel Diaz testifying, you know, from talking to people and in fact, from her own experience, she was, in fact, a former user of methamphetamine herself that I think that that was fine. But but again, the problem here is that Agent Minton didn't just do that. He testified to the hearsay and then he immediately tacked on, I believe this guy. And so by by doing these things in combination, this lent, I think, an unnecessary weight. He bolstered the credibility of the hearsay declarant. The only usefulness of that testimony was if it was, in fact, true that this guy, his body was wrecked because he'd used two grams per day. And so by doing that, I think he in turn bolstered his own credibility. And because this was the fighting issue in the case, your honors, I think that this is certainly gives rise to a question, because if the jury was less inclined to believe Isabel Diaz, more inclined to believe Agent Minton, then they were also more inclined to believe the somewhat incredible witnesses that testified, Mr. Navrakol and Ms. Taylor. I do see that I'm running low on time, your honors. I'd like to save the rest of my time for rebuttal if you don't have any further questions at this time. All right. Thank you. Thank you, Ms. Jansen. Mr. Wade. May it please the court and counsel. This is a trial verdict case with several claims by the defendant, but the overall theme being that was insufficient evidence or not enough evidence presented to convict the defendant, or if so, it was only because of inadmissible hearsay in regards to the one comment by the officer or improper jury instruction in regarding the purity of methamphetamine. Counsel, what other evidence besides that drug quantity evidence was offered to establish guilt here? Well, there's a number of things, and this is a kind of case that like many of my cases that I've tried are. It's a methamphetamine, one ounce methamphetamine seizure, but the seizure was based on captured co-conspirator, drug dealer, dialing for dope, being asked, I mean, asked who his source is saying it's this person in my phone, Omaha Mexican lady. Will you call her? Yes. Called her. Talked to her again, as counsel indicated, very short conversation, very cryptic conversation. Are you coming? He later testified that that's how they communicated. Are you coming? Will you come? I need to see you. Two hours later, she shows up with an ounce of methamphetamine in her bra with her driver, probably her source as well, probably ultimate source, but no use of paraphernalia on anyone, no use of paraphernalia in the car. That was also testified to as to that being a basis for being a distribution weight or more indicative of non-personal use. There's no personal use paraphernalia on her in her car, in her possession or her driver's possession. And then you follow that up with the both cooperators. They're essentially drug-based paramours. Navarco and his on-again, off-again drug-based girlfriend, Cole Cabrera, both said, this is who we got our last few months, last number of months. This is who we got our methamphetamine from. And she would bring an ounce, sometimes more. This other guy would also come sometimes. Most they got was four or six, but they usually got an ounce. She shows up with an ounce. They also talk about over time getting about a pound. Each of them, it was one was a little less. I think she was a little less than him, but sometimes they got dope, not together. So that was corroborative of each other. That was corroborative of what exactly happened. That was how they actually did it. The actual deal took place where prior deals had happened before, according to both cooperating witnesses. And then there was what I call the devastating evidence in this case that I found most effective for me to present was the text messages. I mean, we had phone records that showed the calls were being made over the last number of 30 days or so, consistent with when Navarro said he was dealing with her, the source. And then we had text messages that cryptically as they are, both witnesses testified as to what they meant. In particular, there was, as I recall, there was one where it went about money and wiring money from Cole Cabrera to the defendant and having to do that in order to avoid the reporting laws. I need to put this under this name. I need to put that under this name. We need to stay under $1,000 for each because you owe me $1,400, but we do 700 and 700, two different names of deliverers, two different names of recipients. When that was all explained, that just corroborated, I mean, kind of brought the whole case into a big circle. So there was essentially two witnesses controlled by operation, documentary evidence and corroboration there too, but pretty devastating in how it all tied together. And frankly, Officer Minton's testimony was just a very minor part of it, other than to explain the modus operandi, which this court has often said an expert can do. And what is kind of left out of this expert testimony is that Agent Minton, probably one of the most qualified experts I've used because he had, I think it's 18, 19 years of experience. He's been in several different jurisdictions, Denver, Sioux Falls, Sioux City, back to Sioux City. And in between he was in Afghanistan for three or four years, all dealing with drug trafficking and had done search warrants, use of confidential informants. He'd bought dope. He'd supervised other individuals buying drugs. And then he talked to, I think, as he said, and what's focused here by the defense is he talked to users, he talked to dealers, he talked to buyers and sellers and their family members as to what was going on in each of those one of the sources of the information. It is what he immediately says prior to discussing the two grams, but his testimony before that was all his experience. And if you check the questioning that I made based on all his experience and training, what is a typical user involved with? That's where that context of that statement came out. Now, I agree his use of the word belief, not asked for, but probably was, you know, inartful on his part. But the bottom line is that he was testifying about the lights have gone off here. I'll just, if you want to let me know, I'll just use the clock. All right. All right. I think you got about 10 minutes left, if I remember right. Oh, yes, he does. Nine and a half minutes. Okay. Off here, though. Yeah, I see that. Yeah, it just went blank, but I didn't do anything. I don't think. But Agent Minton was essentially saying that he had, based on all his training experience, he'd never seen anybody or had never heard of anybody using more than one gram of pure dope. Now, he did explain, which kind of fit in the context of the defense expert, because upon cross-examination, although she had stated that potentially up to seven grams. And one of her sources of information was actually the self-serving statements of the defendant to her as her substance abuse counselor. But she was a former user and she does counsel other individuals. But she wasn't defining seven or eight grams between pure dope or pure methamphetamine, more specifically. And what was a number of years before, what I would refer to as less pure dope, less pure methamphetamine, the 20 or 30 percent levels of methamphetamine that we were seeing, oh, eight, 10, 12 years before, which Agent Minton discussed that individuals could use a lot more back then. The criminalist testified about the same thing, about how the purity had gone up and people can use more. Essentially, the expert's opinion for the like when she used a number of years before and when maybe some of her clients were using, it also didn't really support the fact that 26 grams or an ounce is a user quantity. It might support seven grams is a user quantity, but not 26 grams. Was all this put in front of the jury? Again, I think that's the jury got, and the case likes to say that, you know, we use an expert defense or prosecution to kind of help explain things to the jury. Well, I think it all weighed out for the jury to consider. Now, we don't know how much emphasis they placed on Minton or the defense expert or Cole Cabrera or Navarco or the controlled by, but that's for a jury to sort out in regards to all of it. I mean, it- They get the text messages too. I think the text messages that were probably, which came at the end of the case and the explanations, actually, probably one of the more fascinating parts of my case. I didn't recognize that they were as important as they were until the witnesses testified as to their explanation. I mean, it's like reading as I looked at some of my kids' text messages growing up, I couldn't understand what they mean. I didn't understand these drug-based, to the degree that the drug-based people that were using them knew what they meant because it was their code and they explained it and it kind of circled the evidence back around to exactly what they were doing. If I may, I'll shift to the instruction. The instruction was modeled, it wasn't exact, but it was modeled after Eighth Circuit model instructions regarding use of evidence that could be considered for distribution consideration, including quantity, purity, and other probably wasn't appropriate for this case, was it? And let me elaborate because the testimony was this was all used at 100%. Yeah, I think it was, Navarro had it for 100%, they had it for 100%. It was 100% what he was getting from them before, it was 100% what he had, what he was caught with. There was really no evidence that it was going to be cut. However, the court did put in its instruction a couple other, I guess, arguable requirements that were not in, they're not in the models that the defendant would have to know the purity, you know, the purity could be evidence of distribution if the defendant knew it and knew that it was going to be cut. And there was no evidence presented of either of those. It was sort of unnecessary. Well, no, actually, wasn't there evidence presented that it was not intended to be cut? I defer to you if you saw that. I didn't recall seeing that. I thought there was testimony that ICE is used at 100%. I believe the criminalist did speak to the fact that it often is. I don't know if he said in this, I don't know if there's somebody said specific in this case, it was going to be that if it was, it would have been Navarro call. Let me ask it this way. Did anybody testify that this was intended to be cut? No, that's what I was going to say. Nobody did. I'm not sure it was harmful, but it doesn't seem like it was appropriate in this case to include the purity. Again, I don't think it was harmful, but I think the addition of the two other requirements maybe mitigated the potential harm that it could have had, but there was no evidence that it was going to be cut. The third issue was venue in this case. In this particular case, didn't use the exact words Northern District of Iowa, but did use Sioux City, did reference benchmarks locations. There was multiple references as noted in my brief by multiple witnesses of acts because all you need is one act by a co-conspirator. Navarro call admitted to certain acts at all these locations and I outlined them, all the officers outlined all those particular locations in Sioux City and parts of Sioux City residences, Riverside being a part of Sioux City. And the court did eventually take a judicial notice of the fact that Sioux City was in Woodbury County, Woodbury County was in the Northern District of Iowa, which it can be done. And the standard for that is a preponderance of the evidence standard as opposed to anything higher. Finally, just overall, on the motion for acquittal in the new trial, there was essentially a variety of different types of evidence, including actual drug seized, actual conversations about drug trafficking, cooperator testimony, all corroborated by phone and text messages, which basically circled around and basically corroborate each other. And there was the mention of the expert testimony regarding drug trafficking of this type being the type of drug trafficking that goes on in methamphetamine type cases of this nature. But the comment regarding one gram versus two grams, seven grams versus 26 grams, I think was a jury question that they got some expertise from both sides on and then weighed it out. That concludes all my comments. If the court has any other questions, I'd be happy to answer. Thank you, Mr. White. Do you know how much time the appellant has? I do. One minute, 51 seconds. I apologize. I can see it here. Your Honors, I'd just like to briefly comment on a few of the things that the government stated. As to the purity inference, Your Honor is correct. There was specifically evidence in the record. Agent Minton specifically testified at page 276 of the transcript that with crystal meth, it's close to 100%. If you cut it, it's not going to cut because you can tell if it's cut. It no longer looks like glass or like shards of glass form. So you know it's not going to be pure and people don't want that anymore. So he essentially indicated it was very clear. Now, back in 1947, this court said that it's improper to give an instruction that's not adequately supported by the evidence. And I think that everyone knew up front that this instruction did say consider purity if there's evidence that it's intended to be cut. It did, Your Honor. All the evidence is that it's not intended to be cut. So wouldn't the jury most likely have said, well, then purity is not really on the table here for that particular. Well, I think that's possible, Your Honor. But I also think there was a great deal of emphasis at the trial on the fact that this was 100% pure methamphetamine and quite a bit was made out of the fact that it was 100% pure and how that made it just that much more likely that Ms. Lopez intended to deal it when that is just simply not what the evidence supported. So I think that when viewed in conjunction with the other issues that we've raised, this really does kind of create some more problems that the jury certainly could have been very confused by this instruction and why is it even there when they didn't hear any such evidence. On the venue instruction, I'd also like to briefly comment, Your Honor, we fully recognize this is subject to a lesser proof, but this court has said repeatedly that venue is an essential element of the government's case. And we don't dispute that there were numerous references to events occurring in Sioux City, but the government had asked the court to take judicial notice of the venue issue in advance of the trial and in the court's annotated jury instructions, which are at docket number 73-2, the court specifically said, the prosecution requests identification of Sioux City and Woodbury County as locations in the Northern District. I have concluded, however, it is the prosecution's responsibility to prove that any pertinent locations are in this district. And that is in fact what the law provides. And counsel simply didn't do that. The government put on no testimony whatsoever. I've reviewed the record multiple times. There are no references that Sioux City is in fact in the Northern District of Iowa. You don't think that's noticeable? Your Honor, I do think that the court can take judicial notice of that. Absolutely. But the problem in this case is the court took judicial notice of that fact after the trial had concluded. Venue is a fact question for the jury to determine, and the jury certainly couldn't consider a fact that the court judicially noticed if it was never advised that the court had judicially noticed that fact. So I think that that's something that the case law hasn't made clear. There's kind of some questions going on in the case law. I mean, I think that there's lots of things that support venue, but I think it's important that the government actually connect that link. At what point did the defendant object to venue? Your Honor, the counsel raised it in his Rule 29 motion at the close of the government's evidence that the government had failed to prove venue and also raised it again in the post-trial motion. The court took it under advisement in its ruling on the post-trial request for a new trial. The district court took judicial notice that Sioux City and the events that occurred in the Northern District of Iowa, but the jury was never given the chance to hear that. The final comment I'd make, Your Honors, is counsel did state we don't know how much credibility the jury gave, and this ties back to my hearsay argument that this injection by Agent Minton of the hearsay testimony into the record and his gratuitous commentary on its believability, it affected the credibility throughout the trial. And when combined with these problems with the government failing to prove venue, to make that link at trial that it had the obligation to make, and when you have this additional jury instruction that was completely unsupported by the evidence, I think that the record supports a conclusion that these errors had more than a slight influence or certainly had a substantial influence on the jury's verdict. And those reasons, we would request that the court reverse the case and remand to the district court to order a new trial. Do Your Honors have any further questions? I see none. Thank you. Thank you, Ms. Jansen. The court wishes to thank both of you for your presence and the argument you provided to the court this morning. The briefing that you've submitted will take your case under advisement. Madam Clerk, would you call the final argument for the morning? The final argument this is Corey Moore, et cetera.